# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### 1:15-cv-284-FDW

| | | |
|---|---|---|
| **BRIAN K. LEWIS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **NORTH CAROLINA DEPARTMENT OF** | ) | |
| **PUBLIC SAFETY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**THIS MATTER** comes before the Court on Defendants' Motions for Summary Judgment, (Doc. Nos. 93, 98, 102), on the claims asserted against them by the sole remaining Plaintiff, Jamie R. Spake.

## I.    BACKGROUND

*Pro se* incarcerated Plaintiffs including Jamie R. Spake filed a civil rights suit pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and Rehabilitation Act ("RA"), and the North Carolina Constitution. Plaintiffs claimed that they were denied treatment with "breakthrough" drugs[1] for their Hepatitis-C viral ("HCV") infections and were discriminated against on the basis of their HCV infections. (Doc. No. 12). The Amended Complaint passed initial review on Plaintiff Spake's claims against North Carolina Department of Public Safety ("NCDPS") David W. Guice, NCDPS Secretary Frank L. Perry, NCDPS Medical Director Paula Y. Smith, NCDPS Western Regional Medical Director Sandra Pittman, Mountain View

---

[1] The new class of drugs includes Harvoni and Viekera-Pak and are known as direct acting anti-viral drugs or "DAAs." <u>See</u> (Doc. No. 103 at 2, n.1).

Correctional Institution Lead Nurse Norma Melton, Mountain View C.I. Administrator Mike Slagle, Avery-Mitchell C.I. Administrator Mike Ball, NCDPS Physician Robert J. Uhren, and Physicians Assistant Keith C. D'Amico who worked for NCDPS as an independent contractor. (Doc. No. 47).

**(1)** **Amended Complaint** (Doc. No. 12)

In his unverified[2] Amended Complaint, Plaintiff alleged that he is infected with HCV and was incarcerated at Mountain View C.I. when he filed the lawsuit. He had previously been incarcerated at Avery-Mitchell C.I. He claimed to have serious health complications stemming from his HCV infection.

"Breakthrough" oral prescription drugs for HCV became available in 2014 and are the prevailing medical standard of care to cure HCV infection. NCDPS and NC Department of Prisons ("NCDOP") Health Services systematically denies these necessary breakthrough prescription drug treatments to HCV-infected inmates for non-medical reasons. NCDPS policy and procedures have allowed Defendants to turn a blind eye to Plaintiff's serious medical needs with knowledge that their actions would cause Plaintiff's mental and physical health including cirrhosis, irreversible liver damage, and death. This exposes Plaintiff to a high probability that the infection will cause severe physical and mental deterioration, great pain and suffering, severe illness, and inevitably death. DPS policy creation and implementation manifest willful, callous, and deliberate indifference to Plaintiff's serious medical needs of HCV infection in violation of the United States Constitution, as well as the Americans with Disabilities Act, the Rehabilitation Act, and the North Carolina Constitution.

NCDPS Commissioner Defendant Guice is responsible for policy and procedure,

---

[2] See (Doc. No. 12 at 57).

2

administration, and supervision of staff and employees.

NCDPS Secretary Defendant Perry is responsible for all oversight, operation, and administration of NCDPS, including providing appropriate medical treatment and the formulation of policy and procedure to ensure Plaintiff's treatment.

NCDPS Medical Director Defendant Smith serves on the Utilization Review ("UR") Board and oversees delivery of all medical services to NCDOP. She is responsible for establishing medical policy and procedure that governs medical treatment of all inmates within the NCDOP.

NCDPS Regional Medical Director Defendant Pittman is responsible for supervising and monitoring delivery of all medical and dental care services throughout Western District of North Caroilna at a level consistent with community standards.

Mountain View C.I. Lead Nurse Defendant Melton is responsible for supervising and monitoring delivery of all medical and dental care services within Mountain View C.I. at a level consistent with community standards.

Since 2012, Defendants Smith, Pittman, and Melton, have denied and continue to deny treatment which is the professional medical community standard of care to cure HCV infection and relieve the effects of end stage liver disease and chronic liver failure. Since June 2012, Defendants Smith, Pittman, and Melton have denied and continue to deny necessary medical follow-up to track and halt the emotional and painful effects of end stage liver disease and chronic liver failure including regular blood work, ultrasound, and CT scans which are medically necessary for individuals with HCV. Defendants Smith, Pittman, and Melton refused with deliberate indifference to provide Plaintiff with access to be evaluated by a hepatologist or gastroenterologist for proper treatment of HCV.

Defendants Slagle and Ball are the Administrators responsible for supervising and

monitoring the delivery of all medical and dental care services at Mountain View C.I. and Avery-Mitchell C.I., respectively. They must ensure that care is provided at a level consistent with community standards at their prisons.

Defendants Uhren and D'Amico are the primary medical providers for NCDPS/NCDOP Health Services. They are both treating physicians who provide medical care at Mountain View and Avery Mitchell C.I.s. As such, they have an obligation to provide independent, individual, safe, effective medical care to each Plaintiff consistent with the community standard of medical care. They were deliberately indifferent for refusing to treat Plaintiff's disability and disease and serious medical need of HCV infection in compliance with the current standards of individualized professional medical care. Since 2012, Defendants Uhren and D'Amico have denied and continue to deny treatment which is the professional medical community standard of care to cure HCV infection and relieve the effects of end stage liver disease and chronic liver failure. Since June 2012, Defendants Uhren and D'Amico have denied and continue to deny necessary medical follow-up to track and halt the emotional and painful effects of end stage liver disease and chronic liver failure including regular blood work, ultrasound, and CT scans which are medically necessary for individuals with HCV. Defendants Uhren and D'Amico refused with deliberate indifference to provide Plaintiff with access to be seen or evaluated by a hepatologist or gastroenterologist for proper treatment of HCV.

A June 2011 needle liver biopsy revealed that Plaintiff suffers from "End Stage Liver Disease (Stage 4) due to HCV Infection Virus." (Doc. No. 12 at 24). On June 14, 2012, Plaintiff was sentenced to 20 months' imprisonment at NCDPS ("First Incarceration").[3] Immediately after

---

[3] The undisputed record reveals that, during his First Incarceration, Plaintiff was housed at Avery-Mitchell C.I. between July 5, 2012 and January 4, 2014. (Doc. No. 95-2 at 2-3).

sentencing, Plaintiff lapsed into a hepatic encephoalopathy coma that was, upon belief, directly caused by his liver disease. Id. Plaintiff was transferred from County jail to Salisbury C.I. infirmary. Due to his "delirium" and "fatal condition," Plaintiff was moved without justification to segregation. (Doc. No. 12 at 24-25). His condition finally improved enough to be transferred to Avery Mitchell C.I. where he immediately began seeking treatment for his HCV and end stage liver disease through sick calls and grievances. He was repeatedly denied treatment by Defendants Uhren and D'Amico, "quoting Policy and Procedure," and telling him that, even if he was in a life-threatening condition due to his end-stage liver disease, they were "unable to treat his HCV Virus Infection per policy and procedure." (Doc. No. 12 at 25). Plaintiff was released from custody in March 2014.

On September 27, 2015, Plaintiff was remanded to NCDPS to serve a 35 to 54-month sentence ("Second Incarceration").[4] (Doc. No. 12 at 26). Plaintiff mentioned his medical issues at sentencing and the judge ordered "the benefit of any educational [or] vocational opportunities or needed medical treatments, given his condition" and that Plaintiff "be the recipient of any treatment that might help him, whatever that may be." (Doc. No. 12 at 26). Despite the judge's order, "no treatment of any kind has been provided" as of the date the Amended Complaint was filed on March 4, 2016. Id.

While incarcerated, Plaintiff has diligently requested HCV treatment, routine blood work and monitoring, and he has been repeatedly denied for non-medical reasons, i.e., "Policy and Procedure." (Doc. No. 12 at 28).

Denial of treatment has caused Plaintiff substantial physical and mental deterioration

---

[4] The undisputed record reveals that, during Plaintiff's Second Incarceration, he was housed at Mountain View C.I. from April 2, 2015 to February 18, 2016 and from March 10, 2016 to March 17, 2016. (Doc. No. 95-2 at 2).

including "irreversible liver damage which has manifested into liver cancer, liver failure and inevitably will cause their deaths, and this damage can be determined for trial." (Doc. No. 12 at 3). This irreversible damage and deterioration would not have been as severe had breakthrough drugs been provided to Plaintiff at the onset of their availability. As a direct result of Defendants' deliberate indifference, Plaintiff's condition continues to deteriorate, causing him great suffering and emotional and physical pain directly caused by HCV, which will inevitably lead to his death. Medical treatment for Plaintiff's HCV is urgent due to his advanced end-stage liver disease and liver deterioration; once his liver decompensates the only available treatment will be liver transplant. (Doc. No. 12 at 29).

Plaintiff alleges that the denial of the standard of care treatment has caused him physical and emotional pain and suffering and deterioration. (Doc. No. 12 at 32).

Plaintiff seeks injunctive relief,[5] declaratory judgment, compensatory, nominal, and punitive damages, interest, costs, and reasonable attorney's fees, and all other relief that the Court deems just and proper.

 (2)      **Defendant Uhren's Motion for Summary Judgment** (Doc. No. 93)

Defendant Uhren argues that he should be granted summary judgment on Plaintiff's § 1983 deliberate indifference claim and his claim under the North Carolina Constitution because he was not deliberately indifferent to a serious medical need. Defendant relies on the medical records and his own affidavit. During Plaintiff's two incarcerations, Defendant Uhren ordered and reviewed numerous tests to monitor his HCV. When Plaintiff became eligible for referral to a hepatologist

---

[5] Plaintiff also requested a mandatory preliminary injunction that was denied at the time of initial review. (Doc. No. 47 at 8-12).

who could evaluate him for treatment under NCDPS's HCV policy, he referred Plaintiff to a hepatologist. Pursuant to this referral, it was determined that Plaintiff was eligible for treatment with Harvoni, which Plaintiff received. Defendant Uhren provided care to Plaintiff pursuant to NCDPS's policies and procedures, which Defendant Uhren was not responsible for creating or implementing. The policies applicable during Plaintiff's incarcerations did not give primary care providers ("PCPs") like Uhren the authority to decide whether to treat Plaintiff's HCV and did not permit him to select which medication Plaintiff would receive if treatment was appropriate. Defendant Uhren's role was limited to evaluating inmates based on criteria in the policies and submitting a UR Request for a hepatology clinic referral if an inmate met those criteria; the medical records and Defendant Uhren's affidavit demonstrate that Uhren evaluated and monitored Plaintiff's HCV pursuant to NCDPS policy. Based on Plaintiff's symptoms, Uhren's chart reviews, and Uhren's examinations of Plaintiff, Uhren did not believe treatment other than that prescribed to Plaintiff was medically necessary. Defendant Uhren was not subjectively aware of any need to take additional measures for Plaintiff's HCV or other complaints.

Further, Plaintiff has failed to demonstrate proximate cause. The medical records do not demonstrate that Plaintiff suffered any injury as a result of any action or inaction by Defendant Uhren. His conclusory allegation that his condition continues to deteriorate as a direct result of Uhren's decision not to treat his HCV is refuted by the record which shows that his liver function remained stable, and Defendant Uhren's uncontroverted testimony shows that it is highly unlikely that Plaintiff suffered any significant liver damage while in NCDPS custody. The same deliberate indifference standard applies to Plaintiff's North Carolina claims and therefore Defendant Uhren is also entitled to summary judgment on those claims as well.

Plaintiff's ADA and RA claims fail because Uhren did not discriminate against Plaintiff

based on a disability. Assuming that Plaintiff could prove a disability, he has not identified a single program or benefit that was denied him on the basis of his HCV, or that Defendant Uhren personally participated in any decisions about Plaintiff's access to any program or services.

Defendant Uhren is entitled to qualified immunity based on the reasonableness of his actions. He had no reason to know that his conduct could violate Plaintiff's rights under § 1983, the ADA, or the RA.

Plaintiff's official capacity claims for compensatory and punitive damages are barred by the Eleventh Amendment.

The ADA and RA do not authorize a suit for monetary damages against Defendant Uhren in his individual capacity.

Plaintiff's claims against Defendant Uhren for injunctive relief are moot and should be denied. Plaintiff was released from custody on August 17, 2017 and was last treated by Defendant Uhren at Mountain View C.I. in March 2016. Moreover, Plaintiff's request for DAAs is moot because he has already received Harvoni treatment. Finally, Defendant Uhren did not create or implement NCDPS's HCV guidelines which guide diagnostic and treatment decisions and, even if Plaintiff's claims for injunctive relief were not moot, it was not within Defendant Uhren's power to provide these remedies.

Plaintiff's allegations do not support an award of punitive damages against Defendant Uhren in his individual capacity. Plaintiff makes no factual allegations that support a finding that Defendant Uhren acted with evil motive or intent or was callously indifferent to Plaintiff's needs.

**(3)    Defendant D'Amico's Motion for Summary Judgment** (Doc. No. 98)

With regards to the § 1983 and North Carolina claims, Defendant D'Amico argues that his own affidavit and the medical records show that he never ignored or disregarded Plaintiff's

symptoms and concerns. When Plaintiff presented to D'Amico, he took appropriate actions based on his medical professional judgment and the NCDPS policies and procedures. D'Amico did not have a culpable state of mind. Plaintiff was treated pursuant to the NCDPS policies that were in place during Plaintiff's incarcerations which did not give PCPs like D'Amico the authority to decide whether to treat his HCV or permit him to select which medication Plaintiff would receive if treatment was appropriate. There is no evidence that D'Amico purposely withheld treatment to cause Plaintiff harm. Nor did D'Amico's acts and/or omissions proximately cause Plaintiff any injury.

With regards to the ADA and RA claims, Defendant D'Amico did not discriminate against Plaintiff on the basis of any disability.

Qualified immunity bars Plaintiff's claims against Defendant D'Amico because he had no reason to know or realize that his conduct could violate Plaintiff's rights under § 1983, the ADA, or RA as he was following NCDPS policy and procedure.

Plaintiff's official capacity claims for compensatory and punitive damages against Defendant D'Amico are barred by the Eleventh Amendment.

The ADA and RA do not authorize suit for monetary damages against Defendant D'Amico in his individual capacity

Plaintiff's claims for injunctive relief against Defendant D'Amico are moot because Plaintiff is no longer incarcerated at Mountain View C.I. and further, he has already received Harvoni treatment. Moreover, injunctive relief should be denied because Plaintiff has failed to support any § 1983 claims against Defendant D'Amico. Even if Plaintiff's claims against Defendant D'Amico were not moot, they should be dismissed because Defendant D'Amico did not create or implement NCDPS's HCV guidelines and it was not within Defendant D'Amico's

power to provide those remedies to Plaintiff.

Plaintiff's allegations do not support an award of punitive damages because there is no evidence that Defendant D'Amico actions were motivated by evil motive or intent or involved reckless or callous indifference to Plaintiff's federally protected rights.

With regards to Plaintiff's claims under the North Carolina Constitution, the Amended Complaint fails to satisfy the pleading requirements of NC Rule of Civil Procedure 9(j) for certification of claims alleging medical negligence, and any Rule 9(j) deficiency is grounds for dismissal.

**(4)** **NCDPS Defendants' Motion for Summary Judgment** (Doc. No. 102)

Defendants Perry, Guice, Smith, Melton, Pittman, Slagle, and Ball (collectively, "NCDPS Defendants") argue that they should be granted summary judgment because, of the nine named Defendants, only two were involve in providing medical care (D'Amico and Uhren) and only one was involved in the creating and implementation of HCV policy (Smith). The remaining Defendants (Perry, Guice, Melton, Pittman, Slagle, and Ball) were not involved in the conduct alleged to support the deliberate indifference claim cannot be liable for such. The record establishes that Plaintiff cannot create a genuine dispute of material fact establishing deliberate indifference either in the medical treatment he received or in the creation and implementation of the HCV policy.

With regards to patient care, the seven NCDPS Defendants (Perry, Guice, Smith, Melton, Pittman, Slagle, and Ball) were not involved in providing patient care are entitled to summary judgment on the medical deliberate indifference claim. Any effort to assert a supervisory liability claim under § 1983 on the NCDPS Defendants based on Uhren's and D'Amico's care fails because: Uhren and D'Amico provided more than adequate care; Plaintiff cannot show that any of

the Department Defendants knew or had reason to know that Uhren or D'Amico (or anyone else) engaged in conduct that exposed Plaintiff to a pervasive and serious risk of injury and did nothing, which then resulted in constitutional injury.

With regards to the creation and implementation of NCDPS HCV Policy, only Defendant Smith was involved in creating and implementing HCV policy, so summary judgment is warranted in favor of the other NCDPS Defendants who lacked involvement in the policy's creation and implementation (Perry, Guice, Melton, Pittman, Slagle, and Ball). With regards to Defendant Smith, the policy in no way supports Plaintiff's assertion of deliberate indifference to a serious medical need. The mere fact that HCV policy differs from other policies or publications does not show deliberate indifference. Plaintiff does not present any evidence of the content of the documents he refers to in the complaint and has failed to satisfy his burden. Plaintiff cites no authority that any of the publications/guidelines create a standard of care applicable to the Department, which was only required to provide adequate medical care and even if one or more of the publications/guidelines did create an applicable standard of care, deviation from that standard was by definition merely negligent that fails to support a deliberate indifference claim. Defendant Smith's actions were justified and not committed with the culpable state of mind required for § 1983 liability – there is no evidence that she was subjectively aware that the HCV policy she created and implemented subjected Plaintiff to an excessive risk of harm to his health or safety because the policy provided for monitoring of Plaintiff's liver function to determine if and when it needed to be treated, the HCV policy was created and implemented in an effort to facilitate the provision of adequate medical care for incarcerated plaintiff's based on many sources of information including outside experts; the policy was not created and implemented in conscious disregard of an excessive risk to inmates suffering from HCV.

Absent contrary authority, the North Carolina Constitution claims should be analyzed under the § 1983 analysis and summary judgment should be granted for the same reasons as the § 1983 claims.

With regards to the ADA and RA claims, the NCDPS Defendants are entitled to summary judgment on Plaintiff's claims of ADA and RA violations because none of these Defendants were involved in the ADA request and process and because the Amended Complaint does not contain allegations about the nature of Plaintiff's disability or that he was qualified for and denied access to specific programs or services on account of his claimed disability. Plaintiff has not presented any evidence of actual harm as a result of any alleged discrimination. Moreover, the evidence demonstrates that NCDPS handled Plaintiff's two requests for accommodations appropriately and in accordance with its protocol and his request for gain time credits based on his claimed disability was approved.

The NCDPS Defendants are entitled to qualified immunity given the reasonableness of their actions.

Plaintiff's official capacity claims for compensatory and punitive damages are barred by the Eleventh Amendment

The ADA and RA do not authorize suit for monetary damages against the NCDPS Defendants in their individual capacities.

Plaintiff's claims for injunctive relief are moot because Plaintiff was released from NCDPS custody on August 17, 2017 and he has already received DAA treatment.

Plaintiff's allegations do not support an award of punitive damages against the Department Defendants in their individual capacities because Plaintiff has made no factual allegations and has presented no evidence to support a finding that the NCDPS Defendants acted with malice or with

willful intent to deprive Plaintiff of his constitutional rights.

**(5)      Plaintiff's Response**

*Pro se* Plaintiff was informed of the importance of responding to Defendants' Motions for

Summary Judgment and the legal standard applicable to such motions. (Doc. Nos. 96, 101, 106);

<u>see</u> <u>also</u> (Doc. No. 79) (pretrial scheduling order providing that responses to dispositive motions

must be filed within 14 days of the date on which the motion is filed unless an extension of time

is granted); LCvR 7.1(e) (responses to motions for summary judgment must be filed within 14

days of the date on which the motion is served). Plaintiff was cautioned that his failure to respond

would probably result in the grant of relief that the Defendants are seeking. (<u>Id.</u>). Plaintiff filed to

file a response or any evidence in opposition of the Defendants' Motions for Summary Judgment.

**(7)      Evidence**[6]

**(A)      Affidavit of Robert J. Uhren, M.D.** (Doc. No. 95)

Defendant Uhren is a board certified family medicine physician with approximately 40

years of experience and is licensed in the state of North Carolina. He was employed by NCDPS as

a primary care provider at all relevant times. He personally treated Plaintiff and reviewed his

medical records.

Plaintiff was housed at Avery-Mitchell C.I. between July 5, 2012 through January 4, 2014

("First Incarceration"), and at Mountain View C.I. from April 2, 2015 through February 18, 2016

and from March 10, 2016 through March 17, 2016 ("Second Incarceration"). Defendant Uhren

had no involvement with Plaintiff while he was incarcerated at Piedmont C.I. between October 8,

---

[6] This section is not exhaustive. In particular, the NCDPS policies, procedures, and Plaintiff's records including his medical files, have been appended to Defendants' Motions for Summary Judgment, are uncontested, and are accepted as true. <u>See</u> Section II(1), *infra*. These records are voluminous and speak for themselves. Therefore, they will be addressed as relevant in this Section and the Discussion Section, but they will not be separately summarized in the interest of judicial economy.

2014 and April 2, 2015, or while he was incarcerated at Warren C.I. between February 18, 2016 and March 10, 2016.

Defendant Uhren denies that he was deliberately indifferent to any of Plaintiff's alleged medical needs. He treated each and every medical condition that Plaintiff personally presented to him or which he observed during chart reviews when Plaintiff or his chart was referred to him.

HCV is a chronic, indolent infection of the liver that is caused by a virus that infects the liver and leads to inflammation. The disease is "progressive but slow acting." (Doc. No. 95 at 3). It causes "little or no symptoms" in the "vast majority" of patients. (Id.). The exact long-term consequences of the condition are unknown. It is a "slow-progressing infection and damage, if any, caused by it usually takes 20 to 30 years to occur." (Id.). As a result, "a diagnosis of Hepatitis C does not require immediate treatment, particularly when liver tests provide no evidence of significant abnormalities or evidence of progression of the disease." (Id.). Unless a patient has an "acute" Hepatitis C infection, there may be "little or no progression of the disease over months or many years." (Id.). Only approximately 20% of patients will suffer serious consequences from HCV infection.

While currently used therapies are more effective, antiviral therapy prior to the institution of Harvoni was only 30 to 50% effective in eradicating the virus and had frequent and sometimes serious medical side effects. There was also a concern among medical professionals that the pre-Harvoni therapy might have an adverse effect on future therapies that might be more effective. Once treatment has been instituted, there are concerns about the impact of interrupting treatment. It is not recommended that a patient discontinue then restart the treatment regimen or fail to complete the entire course of treatment. A patient's ability to receive the full course of treatment without interruption is advantageous.

The decision whether or not to use antiviral therapy is "complex." (Id.). NCDPS, DOP Health Services through its HCV protocols has tried to develop a rational and reasonable process through which to make this decision based on the current state of knowledge of the disease and its treatment.

The treatment of NCDPS inmates with HCV by primary health providers is pursuant to the applicable NCDPS policy, which provides guidance to NCDPS primary care physicians as to how to appropriately manage HCV. In early 2000, NCDPS Health Services formed a HCV task force that developed a protocol for management of HCV in the inmate population, and it is periodically modified and changed. There were three applicable policies during the periods of Defendant Uhren's treatment of Plaintiff: the September 2009 Policy, the June 2013 Policy, and the October 2015 Policy.

Defendant Uhren was not responsible for the creation of, and did not create, any NCDPS policy or procedure pertaining to the treatment of NCDPS inmates with HCV. (Doc. No. 95 at 64). Nor was Defendant Uhren responsible for the implementation of, and did not implement, any NCDPS policies or procedures pertaining to the treatment of NCDPS inmates with HCV. Defendant Uhren was not responsible for and did not create the September 2009 Policy, the June 2013 Policy, or the October 2015 Policy. Defendant Uhren was not responsible for the implementation of, and did not implement, the September 2009 Policy, the June 2013 Policy, or the October 2015 Policy.

In Defendant Uhren's opinion based on his education, training, and experience, since HCV is generally a disorder that progresses very slowly, Plaintiff's liver enzyme shows that it is highly unlikely that he has suffered any damage to his liver while confined in the custody of NCDPS. Based on Plaintiff's symptoms, Defendant Uhren's review of his chart, and Defendant Uhren's

personal examinations of Plaintiff, Defendant Uhren "did not believe that treatment and/or medications other than those prescribed to him were medically necessary." (Doc. No. 95 at 65). During his treatment of Plaintiff, Defendant Uhren "conducted chart reviews and physical examinations, ordered and renewed his prescriptions, and ordered and reviewed diagnostic tests and other treatment modalities when [Plaintiff's] various medical conditions required it, and referred him to appropriate specialists when necessary." (Doc. No. 95 at 65). Defendant Uhren received and reviewed the recommendations of other health care providers, including consulting hepatologist to whom Plaintiff was referred for care.

Between July 5, 2012 and March 17, 2016, Defendant Uhren personally examined Plaintiff on at least eight occasions and performed chart reviews of his medical records and/or test results on at least 23 occasions. Defendant Uhren also ordered the submission of at least six Utilization Review Requests for Plaintiff. Plaintiff was seen by various other health care providers including physician assistants, nurses, and a hepatologist. He was seen in Sick Call Appointments on at least 21 occasions and was treated in the medical clinic on other occasions with nurses on at least 10 occasions.

"At no time did [Defendant Uhren] disregard the symptoms and/or concerns with which [Plaintiff] presented, but to the contrary, [Defendant Uhren] took appropriate action and made professional decisions and treatment recommendations/referrals based on [Plaintiff's] complaints." (Doc. No. 95 at 65). None of Defendant Uhren's actions or decisions were "taken for the purpose of causing harm to [Plaintiff]." (Id.). Defendant Uhren "did not ignore [Plaintiff's] medical needs or deny him any necessary treatment for any alleged medical condition." (Doc. No. 95 at 65-66). Decisions and recommendations regarding Plaintiff's HCV care and treatment were made pursuant to the then-applicable NCDPS policy while he was under Defendant Uhren's care.

Defendant Uhren was not deliberately indifferent to any of Plaintiff's alleged medical needs.

NCDPS has Policy and Procedure for the Reasonable Accommodation of Inmates with Disability ("ADA Policy") and a Policy and Procedure for Sentence Credits ("Sentence Credits Policy"). (Doc. No. 95 at 72). Pursuant to the Sentence Credits Policy, an inmate is not eligible for ADA assigned sentence credits if the offender "can be given a reasonable accommodation that enables him or her to be assigned to a full time job, program, activity or service." (Id.). Pursuant to the ADA Policy, for an inmate to be considered for an award of medical unfit gain time sentence credits, an inmate must submit an Inmate Reasonable Accommodation Request Form ("IRAR Form") requesting ADA gain time accommodation. (Id.). After submission of the IRAR Form, an NCDPS social worker performs and ADA assessment to determine whether or not the inmate qualifies for ADA status. If the inmate does not qualify, then no further action is taken. If the social worker determines that the inmate meets the definition of "disabled" under the ADA, then the social worker and disability case manager will determine whether or not the inmate is qualified for a job, program, or activity for which gain time can be earned. If the inmate is qualified and if there is availability for placement, and if reasonable accommodations can be made to the job, program, or activity to allow the inmate's participation, then gain time will be awarded at the rate allotted for the job, program, or activity to which the inmate is assigned. If reasonable accommodations cannot be made, then the inmate will receive medically unfit gain time earned at the maximum eligible rate. The process of determining whether or not an inmate should receive medically unfit gain time is managed by social workers and disability case managers; physicians usually are not consulted.

Plaintiff submitted IRAR Forms on February 12, 2013, April 20, 2015, November 22, 2015, November 26, 2015, and December 14, 2015. On November 26, 2015, Ms. Dalton conducted

an ADA evaluation in response to Plaintiff's November 26, 2015 IRAR Form and noted the physical impairments and physical limitations contained in his medical chart. Based on her review, Ms. Dalton recommended that Plaintiff receive ADA gain time. On January 5, 2015, Mr. Gibbs reviewed Plaintiff's December 14, 2015 IRAR Form and noted that he had already been assigned ADA status and was receiving the appropriate level of gain time.

At no time was Defendant Uhren consulted regarding an IRAR Form pertaining to Plaintiff or a request for him for ADA disability status. At no time was Defendant Uhren consulted regarding Plaintiff's eligibility to participate in any program or receive any benefits based on his HCV status, and denies discriminating against him in any way.

**(B)** **Affidavit of Keith C. D'Amico PA** (Doc. No. 100)

Defendant D'Amico is a Physician Assistant with approximately 24 years of experienced and is licensed in the state of North Carolina. He is an independent contractor for assignments at NCDPS facilities. At all times relevant to this case, Defendant D'Amico was contracted to provide care as a PA at Avery-Mitchell C.I. and Mountain View C.I. Under North Carolina law, PAs are required to practice under a supervisory agreement with a licensed physician. At all relevant times, Defendant Uhren was Defendant D'Amico's supervising physician. The information in the affidavit pertains to Plaintiff's First Incarceration and Second Incarceration.

During his treatment of Plaintiff, Defendant D'Amico conducted chart reviews and physical examinations, ordered and renewed his prescriptions, ordered and reviewed diagnostic tests and other treatment modalities when Plaintiff's various medical conditions required it, and referred him to physicians when necessary.

Between the dates of May 29, 2013 and March 15, 2016, Defendant D'Amico personally examined Plaintiff on at least seven occasions and performed chart reviews of his medical records

18

and/or test results on at least 16 occasions. Defendant D'Amico ordered the submission of at least UR Requests for Plaintiff and completed at least four Consultation/Referral forms. Defendant D'Amico referred Plaintiff's HCV questions and labs to Dr. Uhren on at least two occasions. Plaintiff was seen by various other health care providers, including physicians, physician assistants, nurse practitioners, and a hepatologist.

At no time did Defendant D'Amico disregard the symptoms and/or concerns with which Plaintiff presented. Defendant D'Amico took appropriate action and made professional decisions and treatment recommendations/referrals based on Plaintiff's complaints and lab results. Defendant D'Amico's clinical decisions were not made for the purpose of causing harm to Plaintiff. He did not ignore Plaintiff's medical needs or deny him any necessary treatment for any alleged medical condition. Decisions and recommendations regarding Plaintiff's HCV care and treatment were made "pursuant to the working relationship [Defendant D'Amico] had with Dr. Uhren and NCDPS policy…." (Doc. No. 100 at 24). Defendant D'Amico denies that he was deliberately indifferent to Plaintiff's alleged medical needs.

Defendant D'Amico was not responsible for the creation of, and did not create, any NCDPS policies or procedures pertaining to the treatment of NCDPS inmates with HCV. Defendant D'Amico was not responsible for the implementation of, and did not implement, any NCDPS policies or procedures pertaining to the treatment of NCDPS inmates with HCV. Defendant D'Amico was not responsible for and did not create the September 2009 Policy, the June 2013 Policy, or the October 2015 Policy. He was not responsible for the implementation of, and did not implement, the September 2009 Policy, the June 2013 Policy, or the October 2015 Policy.

Plaintiff indicated in his December 14, 2015 IRAR Form that Defendants D'Amico and Uhren were helping him to receive ADA gain time. Defendant D'Amico did not participate in the

review of any of Plaintiff's IRAR Forms nor was he consulted regarding any of their content. At no time was Defendant D'Amico consulted regarding Plaintiff's eligibility to participate in any program or to receive benefits based on his HCV status, nor did Defendant D'Amico ever receive a request from Plaintiff for ADA disability status. Defendant D'Amico denies discriminating against Plaintiff.

**(C)**      **Affidavit of Renita Stroup** (Doc. No. 104-1)

Renita Stroupe has been a Nurse Supervisor at Avery-Mitchell C.I. since November 2015 and, before that date, she was the Lead Nurse at Avery-Mitchell. Her responsibilities as Nurse Supervisor include serving as a supervisor for all other nursing and other healthcare staff who work in the Avery-Mitchell medical unit.

The types of staff at Avery-Mitchell who are directly involved in patient care to inmates are limited to registered nurses, licensed practical nurses, physician assistants, and medical doctors. While Stroup supervises various medical personnel, she is not directly involved in providing patient care to inmates. Not now, or at any time since she has worked at Avery-Mitchell, have Facility Administrators, Assistant Facility Administrators, or various other correctional staff (other than those listed above) been involved in providing patient care to inmates. Not now, nor at any time since Stroup has worked at Avery-Mitchell, have other employees and executive management of the Department such as the Director of Health Services for the Division of Prisons of the Department, the Nurse Supervisor for the Western Region for the Division of Prisons of the Department, the Commissioner of Adult Correction and Juvenile Justice, or the Secretary of the Department, been involved in providing patient care to inmates. Defendants Smith, Pittman, Guice, Perry, and Ball were "never involved in providing patient care to inmates at Avery-Mitchell including [Plaintiff]." (Doc. No. 104-1 at 3).

**(D)**     **Affidavit of Norma Melton** (Doc. No. 104-2)

Defendant Melton is a Nurse Supervisor at Mountain View C.I. and was so employed between July 2012 and February 2016. Her responsibilities as Nurse Supervisor include serving as a supervisor for all other nursing and other healthcare staff who work in the Mountain View medical unit. The types of staff at Mountain View who are directly involved in patient care to inmates are limited to registered nurses, licensed practical nurses, physician assistants, and medical doctors. While Melton supervises various medical personnel, she is not directly involved in providing patient care to inmates.

Not now, or at any time since she has worked at Mountain View, have Facility Administrators, Assistant Facility Administrators, or various other correctional staff (other than those listed above) been involved in providing patient care to inmates. Not now, nor at any time since Melton has worked at Mountain View, have other employees and executive management of the Department such as the Director of Health Services for the Division of Prisons of the Department, the Nurse Supervisor for the Western Region for the Division of Prisons of the Department, the Commissioner of Adult Correction and Juvenile Justice, or the Secretary of the Department, been involved in providing patient care to inmates. Accordingly, Defendants Smith, Pittman, Guice, Perry, and Slagle were "never involved in providing patient care to inmates at Mountain View including [Plaintiff]." (Doc. No. 104-2 at 3).

**(E)**     **Affidavit of Jason Penland** (Doc. No. 104-3)

Jason Penland is the Correctional Assistant Superintendent for Programs at Avery-Mitchell C.I. and was so employed between July 2012 through January 2014, and April 2015 through February 2016. As Correctional Assistant Superintendent for Programs, his responsibilities include consulting with units on programs, policies, and classification, and assessing training of programs

staff. He is familiar with the Department's policy and procedure regarding reasonable accommodation for inmates with disabilities.

The purpose of the Department's ADA policy is to "establish policy and procedures regarding the Prisons' commitment to compliance with ADA and the [RA]." (Doc. No. 104-3 at 2). As the Assistant Superintendent for Programs at Avery-Mitchell, Penland serves as the Facility ADA Coordinator for the facility pursuant to NCDPS ADA Policy.

The ultimate authority to issue a determination regarding an inmate's request for an accommodation lies solely with the Prison's ADA Coordinator. Executive management of the Department such as the Director of Health Services for the Division of Prisons of the Department, the Nurse Supervisor for the Western Region for the Division of Prisons of the Department, the Commissioner of Adult Correction and Juvenile Justice, or the Secretary of the Department, are not involved in facilitating the ADA request determination process. Neither are individual staff and contractors who work at a given facility, such as medical doctors, physician's assistants, and nurses, involved in the final determination of an ADA request. As such, Defendants Ball, D'Amico, Guice, Perry, Pittman, Smith, and Uhren "have no involvement in the ADA request and determination process." (Doc. No. 104-3 at 6). A review of Plaintiff's filed, records, and other materials indicates that he did not submit any request forms while housed at Avery-Mitchell C.I.

**(F)    Affidavit of Dexter Gibbs** (Doc. No. 104-5)

Dexter Gibbs is the Correctional Assistant Superintendent for Programs at Mountain View C.I. Between July 2012 and January 2014, he was the Program Director and between April 2015 and February 2016, he was the Correctional Assistant Superintendent for Programs at Mountain View C.I. As Correctional Assistant Superintendent for Programs, his job responsibilities include consulting with units on programs, policies, and classification, and assessing training of programs

staff. He is familiar with the Department's policy and procedure regarding reasonable accommodation for inmates with disabilities, the purpose of which is to establish policy and procedures regarding the Prisons' commitment to compliance with the ADA and RA. As Correctional Assistant Superintendent for Programs at Mountain View, Gibbs is the ADA Coordinator for the facility pursuant to NCDPS ADA Policy.

The ultimate authority to issue a determination regarding an inmate's request for an accommodation lies solely with the Prison's ADA Coordinator. Executive management of the Department such as the Director of Health Services for the Division of Prisons of the Department, the Nurse Supervisor for the Western Region for the Division of Prisons of the Department, the Commissioner of Adult Correction and Juvenile Justice, or the Secretary of the Department, are not involved in facilitating the ADA request determination process. Neither are individual staff and contractors who work at a given facility, such as medical doctors, physician's assistants, and nurses, involved in the final determination of an ADA request. As such, Defendants D'Amico, Guice, Melton, Perry, Pittman, Slagle, Smith, and Uhren "have no involvement in the ADA request and determination process." (Doc. No. 104-5 at 6).

A review of Plaintiff's filed, records, and other materials indicates that Plaintiff filed two Request Forms at Mountain View. The first Request Form was submitted November 22, 2015. See (Doc. No. 104-7). Plaintiff noted his disability as "end stage liver disease" and requested as ADA accommodation gain time of 9 days per month. (Doc. No. 104-5 at 6). His request was evaluated pursuant to NCDPS procedure and the disability assessment was provided to Gibbs along with a recommendation that the request be denied. Gibbs agreed with the recommendation and forwarded the Request Form to the Prison ADA Coordinator in accordance with policy. The Prison ADA Coordinator disagreed with the recommendation that the request be denied and instead determined

that Plaintiff was approved for ADA assigned gain time credits. On February 5, 2016, Plaintiff signed the determination indicating that he was served with written notice of the approval. See (Doc. No. 104-7 at 4).

The second Request Form was submitted on November 26, 2015. See (Doc. No. 104-8). Plaintiff lists his disability as "end stage liver disease and being denied life save medical service." (Doc. No. 104-5 at 7). He requested as an ADA accommodation that the Department stop violating his rights under the Eighth and Fourteenth Amendments and provide him with life-saving medications. He also requested the disability gain time of nine days per month. His request was evaluated pursuant to NCDPS procedure and the disability assessment was provided to Gibbs along with a recommendation that the request be approved as he was already ADA assigned for gain time credits based on his prior Request. The recommendation included a notification to Plaintiff that the request regarding medical care be addressed through the sick-call process. Gibbs agreed with the recommendations and forwarded the request to the Prison ADA Coordinator, who reviewed and agreed with the recommendations. The Prison ADA Coordinator also noted that Plaintiff should process the medical care requests through the sick-call process. On February 5, 2016, Plaintiff signed the determination indicating that he was served with written notice of the approval. See (Doc. No. 104-8 at 4).

Gibbs searched and did not find any grievance filed by Plaintiff with respect to the denial of an ADA accommodation request.

**(G)** **Affidavit of Paula Smith, M.D.** (Doc. No. 104-9)

Defendant Smith served as the Medical Director for the Division of Adult Correction and Juvenile Justice of NCDPS from 2001 until her retirement in December 2018. Her responsibilities included planning, directing, and supervising the medical services staff and clinical care in all

24

correctional facilities statewide. She was also responsible for regulatory compliance and professional best practices efforts across the correctional institutions as well as for communicating those standards with other executive management such as the Director of Adult Correction and the Commissioner of the Department.

Defendant Smith was involved in the creation and implementation of various portions of the Health Services Policy & Procedure Manual including the parts of the Clinical Practice Guidelines. The Clinical Practice Guidelines section of the Health Services Policy and Procedure Manual provides guidance to primary care physicians who provide care to incarcerated persons in the custody of the Division of Adult Corrections. Section CP-7 is intended to provide guidance with regards to Hepatitis C. Defendant was personally involved in the creation and implementation of the September 1, 2009 (Doc. No. 104-10), June 1, 2013 (Doc. No. 104-11), and October 1, 2015 (Doc. No. 104-12), versions of CP-7. (Doc. No. 104-9 at 2).

While creating and implementing the 2009 version of CP-7, Defendant Smith "reviewed and consulted many sources of information, including but not limited to guidelines from the American Association for the Study of Liver Diseases, medical journal articles, peer-review studies, policy and procedure manuals from other correctional settings, and many more." (Doc. No. 104-9 at 2). She also "consulted with outside experts in liver diseases. (Id.). Each time CP-was modified and updated, Defendant Smith "again, reviewed and consulted many sources of information, and consulted with outside experts in liver diseases." (Doc. No. 104-9 at 3).

The policies, procedures, or guidelines related to health services were "created, implemented, and modified, to facilitate the provision of adequate medical care for incarcerated persons in the custody of the Division of Adult Correction." (Doc. No. 104-9 at 3). As medical director, Defendant Smith was responsible for and oversaw the creation, implementation, and

modification of policies, procedures, or guidelines related to health services such as CP-7. In doing so, she worked with certain employees of the Department including the Deputy Medical Director and the Infection Control Coordinator, but she did not work with the Secretary of the Department, the Commissioner of the Division of Adult Correction, the Nurse Supervisor for the Department, any correctional facility administrators, or individual health care providers at any particular facilities. Accordingly, she did not work with Defendants Perry, Guice, Pittman, Ball, Slagle, Melton, D'Amico, or Uhren on, nor were they involved in, the creation, implementation, or modification of any version of CP-7.

## II.     LEGAL STANDARDS

**(1)     <u>Summary Judgment</u>**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings

to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

Verified complaints by *pro se* prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); Davis v. Zahradnick, 600 F.2d 458, 459-60 (4th Cir. 1979). The law is clear that a plaintiff cannot rely on an unverified complaint in opposing a motion for summary judgment. See Berry v. Atlantic Coast Line R. Co., 273 F.2d 572 (4th Cir. 1960).

Plaintiff has filed an unverified Amended Complaint and has failed to respond to Defendants' Motions for Summary Judgment. Therefore, the affidavits and records filed by Defendants are considered unrefuted and are accepted as true.

**(2)     Deliberate Indifference**

"Prisoners alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth in Farmer v. Brennan, [511 U.S. 825, 832 (1994)]." Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016). First, "Farmer's objective prong requires plaintiffs to demonstrate that 'the deprivation alleged [was],

objectively, sufficiently serious.'" <u>Scinto</u>, 841 F.3d at 225. In order to be sufficiently serious, the deprivation must pose "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a substantial risk of such serious harm resulting from ... exposure to the challenged conditions." <u>De'lonta v. Angelone</u>, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citation omitted).

As applied to prisoners, this constitutional guarantee encompasses a right to medical care for serious medical needs, including psychological needs. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 103-04 (1976). To state a case of deliberate indifference to a serious medical need, a plaintiff must show that he had serious medical needs and that the defendant acted with deliberate indifference to those needs. <u>Heyer v. United States Bureau of Prisons</u>, 849 F.3d 202, 210 (4th Cir. 2017) (citing <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008)). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Iko</u>, 535 F.3d at 241 (internal quotation marks omitted). To constitute deliberate indifferent to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness." <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* <u>Farmer</u>, 511 U.S. at 825. However, mere negligence or malpractice does not violate the Eighth Amendment. <u>Miltier</u>, 896 F.2d at 852. "[M]ere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." <u>Scinto</u>, 841 F.3d at 225 (quoting <u>Wright v. Collins</u>, 766 F.2d 841, 840 (4th Cir. 1985)).

**(3)**      <u>**North Carolina Constitution**</u>

The North Carolina Constitution prohibits "cruel and unusual punishments." N.C. Const.

28

Art. I, § 27. North Carolina Courts and lawmakers have "long recognized the state's duty to provide medical care to prisoners" under its common law and statutory duties as well as under the state and federal constitutions. Medley v. N.C. Dep't of Corr., 412 S.E.2d 654, 657 (N.C. 1992). The North Carolina Supreme Court has recognized that "Article I, Section 27 of the North Carolina Constitution provides a prohibition similar to the Eighth Amendment's Cruel and Unusual Punishment Clause." Id. at 659 (finding that the plaintiff failed to state a claim that DOC had violate his state or federal constitutional rights);[7] see also Leonard v. Bell, 803 S.E.2d 445 (N.C. App. 2017) (acknowledging that the duty to provide health services to inmates has a basis in the U.S. and N.C. Constitutions); see, e.g., State v. Green, 502 S.E.2d 819 (N.C. 1998); State v. Bronson, 423 S.E.2d 772 (N.C. 1992); State v. Rogers, 374 S.E.2d 852 (N.C. 1989).

With regards to medical malpractice claims, North Carolina has substantive legal requirements that a person must follow to pursue such claims. A plaintiff asserting negligence must prove the existence of a legal duty or standard of care owed to the plaintiff by the defendant, breach of that duty, a causal relationship between the breach of duty and the plaintiff's alleged injuries, and certain actual injury or loss sustained by the plaintiff. Camalier v. Jeffries, 460 S.E.2d 133, 136 (N.C. 1995); Blackwell v. Hatley, 688 S.E.2d 742, 746 (N.C. App. 2010). North Carolina Rule of Civil Procedure 9(j) states in relevant part that any complaint alleging medical malpractice by a health care provider pursuant to G.S. 90-21.11(2)a. in failing to comply with the applicable standard of care under G.S. 90-21.12 shall be dismissed unless:

> (1) The pleading specifically asserts that the medical care and all records pertaining to the alleged negligence that are available to the plaintiff after reasonable

---

[7] Justice Martin suggested in his Medley concurrence that arguing that the disjunctive "cruel *or* unusual punishment" language in the N.C. Constitution means that its standard "imposes at least the same duty [as the U.S. Constitution's Eighth Amendment], if not a greater duty." However, the N.C. Supreme Court noted several years later that "research reveals neither subsequent movement toward such a position by either this Court or the Court of Appeals nor any compelling reason to adopt such a position." Green, 502 S.E.2d at 828 n.1.

inquiry have been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care;

(2) The pleading specifically asserts that the medical care and all medical records pertaining to the alleged negligence that are available to the plaintiff after reasonable inquiry have been reviewed by a person that the complainant will seek to have qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care, and the motion is filed with the complaint; or

(3) The pleading alleges facts establishing negligence under the existing common-law doctrine of res ipsa loquitur.

N.C. R. Civ. P. 9(j).

Failure to comply with Rule 9(j) is ground for dismissal of a state medical malpractice claim filed in federal court. See, e.g., Estate of Williams–Moore v. Alliance One Receivables Mgmt. Inc., 335 F.Supp.2d 636, 649 (M.D.N.C. 2004); Frazier v. Angel Med. Ctr., 308 F.Supp.2d 671, 676-77 (W.D.N.C. 2004); Moore v. Pitt County Mem'l Hosp., 139 F.Supp.2d 712, 713-14 (E.D.N.C.2001); see also Thigpen v. Ngo, 558 S.E.2d 162, 165 (N.C. 2002). The North Carolina General Statutes defines a "[m]edical malpractice action" as "[a] civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care provider." N.C. Gen. Stat. 90-21.11(2)a.

**(4)**     **Americans with Disabilities Act**

To establish a *prima facie* case under Title II of the ADA, a plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. See Constantine v. George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005); Baird v. Rose, 192 F.3d 462, 467 (4th Cir.

1999). States are obligated to make "reasonable modifications" to enable the disabled person to receive the services or participate in programs or activities. 42 U.S.C. § 12131(2). A reasonable modification does not require the public entity to employ any and all means to make services available to persons with disabilities. Rather, the public entity is obligated to make those modifications that do not "fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." Miller v. Hinton, 288 Fed. Appx. 901, 902 (4th Cir. 2008) (quoting Bircoll v. Miami-Dade County, 480 F.3d 1072, 1082 (11th Cir. 2007)). The Fourth Circuit has held that the ADA does not recognize a cause of action against employees in their individual capacities. Baird ex rel. Baird v. Rose, 192 F.3d 462, 471 (4th Cir. 1999); see also 42 U.S.C. § 12132 (providing a remedy only against a "public entity"). Punitive damages are not recoverable under the ADA. Barnes v. Gorman, 536 U.S. 181 (2002).

**(5)      Rehabilitation Act**

To establish a *prima facie* case under the Rehabilitation Act, a plaintiff must prove that: (1) he has a disability; (2) he is otherwise qualified for the benefit in question; and (3) he was excluded from the benefit "due to discrimination solely on the basis of the disability." Atkins v. Holder, 529 Fed. Appx. 318, 319-20 (4th Cir. 2013). The Rehabilitation Act has a stricter causation requirement than the ADA in that the disability must be the sole cause, as opposed to one of multiple causes, of the discrimination. See Thomas v. Salvation Army S. Territory, 841 F.3d 632, 641 (4th Cir. 2016). The Fourth Circuit has noted that the RA does not permit an action against individual defendants. See Z.G. by and through C.G. v Pamlico Co. Pub. Sch. Bd. of Ed., 744 Fed. Appx. 769, 781 n.20 (4th Cir. 2018). Punitive damages are not recoverable under the RA. Barnes, 536 U.S. at 181.

**(6)      Sovereign Immunity**

The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity. Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has done nothing to waive its immunity. Bright v. McClure, 865 F.2d 623, 626 (4th Cir. 1989) (citing McConnell v. Adams, 829 F.2d 1319, 1328 (4th Cir. 1987)).

"[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985). Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. See Almone v. City of Long Beach, 478 F.3d 100, 106 (2d Cir. 2007); see Hutto v. S.C. Retirement Sys., 773 F.3d 536, 549 (4th Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(7)     Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md., 999 F.2d

780, 784 (4ᵗʰ Cir. 1993) (quoting Anderson v. Creighton, 483 U.S. 635, 639, 641 (1987)) (internal

citations omitted). Where the defendant's entitled to immunity turns on a factual dispute, that

dispute is resolved by a jury at trial. Id. (citing Turner v. Dammon, 848 F.2d 440 (4ᵗʰ Cir. 1988),

*overruled on other grounds by* Johnson v. Jones, 515 U.S. 304 (1995)).

      In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence

for resolving government officials' qualified immunity claims by determining whether: (1) the

facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the

right at issue was "clearly established" at the time of defendant's alleged misconduct. While the

sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555

U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two

prongs of the qualified immunity analysis should be addressed first in light of the circumstances

in the particular case at hand. Id.

      To overcome the qualified immunity defense at the summary judgment stage, the plaintiff

must have shown facts that make out a violation of a constitutional right, and the right at issue

must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson

v. Commonweath of Va., 878 F.3d 89, 97 (4ᵗʰ Cir. 2017) (citing Pearson, 555 U.S. at 232). The

analysis takes place against the backdrop of two dueling interests: "the need to hold public officials

accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555

U.S. at 231.

      To find a right is clearly established does not mean that "the exact conduct at issue [must]

have been held unlawful for the law governing an officer's actions to be clearly established."

Amaechi v. West, 237 F.3d 356, 362 (4ᵗʰ Cir. 2001). Rather, the court's analysis must take into

consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362-63 (internal quotation omitted). The right at issue is "clearly established" for qualified immunity purposes if:

> [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citation omitted).

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

### III.    DISCUSSION

**(1)    Eighth Amendment Deliberate Indifference**

**(A)**   **Defendants Uhren and D'Amico**

Defendant Uhren argues that he should be granted summary judgment on Plaintiff's § 1983 deliberate indifference claim because he provided reasonable care and did not deliberately ignore any of Plaintiff's medical needs. Defendant D'Amico argues that his own affidavit and the medical records show that he was not deliberately indifferent because he provided reasonable care and never ignored or disregarded a serious medical need of Plaintiff's.

The medical records and affidavits reveal that Defendant Uhren actively monitored and treated Plaintiff's HCV. He ordered and reviewed numerous tests and referred Plaintiff to a hepatologist when he became eligible for such referral, and ultimately received treatment with a DAA pursuant to that referral. In doing so, Defendant Uhren followed the applicable NCDPS policies and procedures, for which Defendant Uhren was not responsible for creating or implementing and under which he did not have the authority to decide whether to treat Plaintiff's HCV or to select which medication Plaintiff would receive if treatment was appropriate. Based on Plaintiff's symptoms, Uhren's chart reviews, and Uhren's examinations of Plaintiff, Uhren did not believe treatment other than that prescribed to Plaintiff was medically necessary. Defendant Uhren was not subjectively aware of any need to take additional measures for Plaintiff's HCV or other complaints and did not deliberately ignore any of Plaintiff's alleged medical needs. Moreover, the medical records do not demonstrate that Plaintiff suffered any injury as a result of any action or inaction by Defendant Uhren and overcome Plaintiff's conclusory and unsupported allegations that his condition deteriorated as a direct result of Uhren's decision not to treat his HCV or caused him any significant liver damage while in NCDPS custody.

Defendant D'Amico also took appropriate actions based on his medical professional judgment and the NCDPS policies and procedures. D'Amico did not have a culpable state of mind.

Plaintiff was treated pursuant to the NCDPS policies that were in place during Plaintiff's incarcerations which did not give PCPs like D'Amico the authority to decide whether to treat his HCV or permit him to select which medication Plaintiff would receive if treatment was appropriate. There is no evidence that D'Amico purposely withheld treatment to cause Plaintiff harm. Nor did D'Amico's acts and/or omissions proximately cause Plaintiff any injury.

Plaintiff's "mere disagreement[]" with the course of treatment he received from Defendants Uhren and D'Amico fails to support a deliberate indifference claim. Scinto, 841 F.3d at 225 (citation omitted). Moreover, to the extent he suggests that Defendants Uhren and D'Amico were negligent or committed malpractice, this contention is unsupported by the record and falls short of the deliberate indifference standard. Miltier, 896 F.2d at 852.

Plaintiff's conclusory allegations that Defendants Uhren and D'Amico provided inadequate and untimely care have been refuted by the affidavits, medical records, and other evidence to the contrary. Plaintiff has failed to demonstrate that a genuine dispute exists with regards to any material fact on his deliberate indifference claim against these Defendants. Therefore, Defendants Uhren and D'Amico's Motions for Summary Judgment will be granted on Plaintiff's § 1983 deliberate indifference claim.

**(B)    NCDPS Defendants**

NCDPS Defendants Perry, Guice, Smith, Melton, Pittman, Slagle, and Ball argue that they should be granted summary judgment because none of them were involved in providing medical care and were not liable as supervisors. Of the NCDPS Defendants, only Defendant Smith was involved in creating and implementing HCV policy, and she was not deliberately indifferent in doing so.

With regards to Plaintiff's medical treatments, Defendants have submitted undisputed

evidence that none of the NCDPS Defendants were personally involved in providing direct patient care and thus they could not have been deliberately indifferent to Plaintiff's serious medical needs through their personal actions. See King v. Rubenstein, 825 F.3d 206, 223–24 (4th Cir. 2016). Nor are they liable in their supervisory roles because Plaintiff received reasonable care from Defendants Uhren and D'Amico. See Section III(1)(A), *supra*; Waybright v. Frederick Co, Md., 528 F.3d 199, 203 (4th Cir. 2008) ("supervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages.").

Defendants Perry, Guice, Melton, Pittman, Slagle, and Ball had no involvement in the creation or implementation of NCDPS HCV Policy and therefore they cannot be deliberately indifferent with regards to that policy. The only Defendant who was personally involved in the creation and implementation of NCDPS HCV Policy is Defendant Smith. The unrefuted record demonstrates that Defendant Smith was not deliberately indifferent with regards to the creation and implementation of NCDPS's HCV Policy. She created, revised, and implemented the Policy based on her own knowledge as a physician, review of publications and other written materials, and consultation with experts in the field. Plaintiff contends that NCDPS Policy should mirror other guidelines such as those adopted by the federal Bureau of Prisons. However, inmates are not entitled to ideal or perfect care, but rather, adequate care. Plaintiff has failed to support his conclusory allegations that NCDPS's policy failed to provide adequate care or subjected him to the excessive risk of serious harm. Plaintiff's mere disagreement with the care provided under NCDPS Policy thus fails to demonstrate deliberate indifference. See Scinto, 841 F.3d at 225. Moreover, to the extent that Plaintiff suggests Defendant Smith was negligent in creating and implementing NCDPS's HCV Policy, this falls short of the deliberate indifference standard.

Miltier, 896 F.2d at 852.

Plaintiff has failed to create a genuine dispute of material fact establishing deliberate indifference either in the medical treatment he received or in the creation and implementation of the HCV policy. Therefore, the NCDPS Defendants' Motion for Summary Judgment on Plaintiff's deliberate indifference claims will be granted.

**(2)      North Carolina Constitution**

Plaintiff seeks relief for "cruel and unusual punishment" under North Carolina Constitution Article 1, Section 27. See (Doc. No. 12 at 46-47).

This Court has previously recognized that "the analysis for Plaintiff's claim under the N.C. Constitution would be nearly (if not, then exactly) identical as its analysis under the Federal Constitution." Griffin v. Mortier, 2018 WL 6060472 at *5 (W.D.N.C. Aug. 14, 2018), *report and recommendation adopted*, 2018 WL 6046184 (W.D.N.C. Nov. 19, 2018), *appeal filed* Dec. 20, 2018. Because Defendants are entitled to summary judgment on Plaintiff's medical deliberate indifference claims under the Eighth Amendment's cruel and unusual punishment clause, see Section III(a), *supra*, they are likewise entitled to summary judgment based on the N.C. Constitution's cruel or unusual punishment clause.

To the extent that Plaintiff intends to assert medical negligence claims against any of the Defendants, they are subject to dismissal because Plaintiff has failed to satisfy the pre-suit requirements under North Carolina law.

Therefore, Defendants' Motions for Summary Judgment will be granted on Plaintiff's claims for relief under North Carolina law.

**(3)      ADA and RA**

Defendants argue that they did not discriminate against Plaintiff on the basis of any

disability, Plaintiff has not identified any program or benefit that he was denied on the basis of his HCV, and none of the Defendants personally participated in any decisions about Plaintiff's access to any program or services. The NCDPS Defendants further assert that NCDPS handled Plaintiff's two requests for accommodations appropriately and in accordance with its protocol and his request for gain time credits based on his claimed disability was approved.

To the extent that Plaintiff suggests that the Defendants denied him proper care by failing to provide medication and treatment for his HCV, these allegations cannot support relief under the ADA and RA. See Miller, 288 Fed. Appx. at 903 (affirming summary judgment for prison officials on prisoner's ADA claim that the institution denied him access to colostomy bags and catheters because he failed to show that he was treated in this manner because of his disability); Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) (holding that the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners…."); Thomas, 841 F.3d at 641 (RA has a stricter causation requirement than the ADA).

With regards to Plaintiff's claims that he was denied educational, vocational, or any other prison programs or opportunities because of his HCV, this is refuted by Defendants' evidence showing that they have no authority over, and were not personally involved, in an ADA request or determination process with regards to Plaintiff. Moreover, Plaintiff's claim is moot insofar as he received the gain time relief that he requested through ADA Request Forms was ultimately granted.

Plaintiff has failed to come forward with any evidence refuting Defendants' evidence or demonstrating the existence of a genuine dispute of material fact. Therefore, Defendants will be granted summary judgment on Plaintiff's ADA and RA claims.

**(4)**     **Qualified Immunity**

Defendants argue that they are entitled to qualified immunity because their actions were reasonable and they and no reason to know that their conduct could violate Plaintiff's rights under § 1983, the ADA, or the RA.

Defendants have prevailed on summary judgment with regards to each of the alleged violation of his constitutional rights. Therefore, he has failed to establish that a constitutional violation occurred. Defendants have submitted uncontroverted evidence demonstrating that their conduct was reasonable. They had no reason to know that they were violating any of Plaintiff's clearly established rights through their actions or inactions. Defendants are therefore entitled to qualified immunity.

**(5)** **Damages**

    **(A)** **Official Capacity**

Plaintiff's claims against Defendants for damages under § 1983 in their official capacities are equivalent to suits against the State and are barred by the Eleventh Amendment. See generally Will, 491 U.S. at 66; Graham, 473 U.S. at 166; see, e.g., Hutto, 773 F.3d at 549. Therefore, no damages are available on Plaintiff's § 1983 claims against Defendants for damages in their official capacities.

    **(B)** **Individual Capacity**

The ADA and RA do not authorize a suit for monetary damages against Defendants in their individual capacities. Baird, 192 F.3d at 471; Z.G., 744 Fed. Appx. at 781 n.20. Therefore, no damages are available against Defendants in their individual capacities on Plaintiff's RA and ADA claims.

    **(C)** **Punitive Damages**

A jury may be permitted to assess punitive damages in a § 1983 action when the

defendant's conduct is shown to be "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others" <u>Smith v. Wade</u>, 461 U.S. 30, 51 (1983). Punitive damages are not available under the ADA or RA. <u>Barnes</u>, 536 U.S. at 181.

Plaintiff's allegations do not support an award of punitive damages against any of the Defendants on his § 1983 claims. Aside from his own conclusory, unsupported and unverified allegations, Plaintiff has presented no evidence to support a finding that the NCDPS Defendants acted with malice or with willful intent to deprive him of his constitutional rights. Therefore, punitive damages are not available.

**(6)**     <u>**Injunctive Relief**</u>

Plaintiff seeks injunctive relief including: ordering Defendants to formulate and implement a new policy and procedure evaluating and treating all HCV infected inmates with clinical guidelines comparable to that offered in the federal Bureau of Prisons; monitoring and medical care for fibrosis, cirrhosis, and liver cancer, with direct access to a hepatologist regarding the need for partial or full liver transplant; discontinuing the use of "toxic" interferon treatment; stopping the withholding DAAs until cirrhosis irreversibly manifests; testing all new inmates for HCV on intake, regardless of custody level; immediately screening all North Carolina inmates who have not been tested for HCV; commencing treatment with DAAs to stop imminent danger of deteriorating liver condition.[8] (Doc. No. 12 at 53-55).

Plaintiff's claims for injunctive relief are moot. Plaintiff was released from NCDPS custody on August 17, 2017 and is no longer under Defendant Uhren's or D'Amico's care, or

---

[8] To the extent that Plaintiff seeks relief on behalf of others, such claims were dismissed on initial review. (Doc. No. 47 at 13).

subject to NCDPS's HCV Policy.[9] Plaintiff's request for DAAs treatment is moot because he has already received Harvoni treatment.

## IV.    CONCLUSION

Based on the foregoing, Defendants' Motions for Summary Judgment are granted in full. The Clerk of Court will be instructed to enter judgment in favor of the Defendants and close this case.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant Robert J. Uhren's Motion for Summary Judgment, (Doc. No. 93), is **GRANTED.**

2. Defendant Keith D'Amico's Motion for Summary Judgment, (Doc. No. 98), is **GRANTED**.

3. Defendants Mike Ball, David Guice, Norma Melton, Frank Perry, Sandra Pittman, Mike Slagle, and Paula Smith's Motion for Summary Judgment, (Doc. No. 102), is **GRANTED**.

4. The Clerk of Court is instructed to close this case.

Signed: January 11, 2019

Frank D. Whitney
Chief United States District Judge

---

[9] Even while Plaintiff was in custody, no Defendant except Defendant Smith had any authority over the creation, modification, and implementation of NCDPS's HCV Policy.